237 S.W.2d 919 (1951)
KANSAS CITY
v.
WILHOIT (three cases).
Nos. 21400-21402.
Kansas City Court of Appeals, Missouri.
March 5, 1951.
*920 David M. Proctor, City Counselor, Forest W. Hanna, Guy W. Rice, Asst. City Counselors, Kansas City, for appellant.
Clif Langsdale, John J. Manning, Kansas City, for respondent.
BOUR, Commissioner.
Ethel Wilhoit, the defendant below, was charged in three separate informations, filed in the municipal court of Kansas City, with violating certain ordinances of the city. The three cases were tried in the municipal court and defendant was found guilty and fined in each case. Appeals were perfected to the circuit court of Jackson County, where the three cases were consolidated and tried together without the aid of a jury. The circuit court found defendant not guilty; the cases were dismissed, and defendant discharged. The city filed its motion for a new trial in each case; and the motions being overruled, it duly appealed to this court from the judgments in favor of defendant. The parties filed a stipulation in this court wherein they agreed that the three cases "may be consolidated and that one transcript may be used in all said cases."
We will consider first the two cases involving alleged violations of the zoning ordinance of Kansas City. The information in Case No. 21400 (No. 4648 in the circuit court) was filed in the municipal court on July 16, 1948, and charged that on or about July 9, 1948, the defendant Ethel J. Wilhoit "unlawfully and wilfully altered her lodging plan in a U-1 district and furnished lodging for more than four persons in a dwelling occupied as a private residence. All in violation of Section 58-7(3), 58-50 of the Revised Ordinances of 1946 of Kansas City, Missouri." (Italics ours.) The information in Case No. 21401 (No. 4867 in the circuit court) was filed in the municipal court on September 14, 1948, and charged that on or about August 30, 1948, defendant herein "unlawfully and wilfully permitted and furnished lodging or boarding for more than four persons in a dwelling occupied as a private residence in a U-1 zoned property. All in violation of Section 58-7 of the Revised Ordinances of 1946 of Kansas City, Missouri." (Italics ours.) The private residence mentioned in each information is the property owned by defendant and located at 3616 Holmes Street, Kansas City, Missouri. As stated, these cases were tried in the municipal court. In the first mentioned case defendant was found guilty and fined the sum of $50. The trial of the second case resulted in a finding of willful violation of the ordinance and a fine of $150. After the trial de novo in the circuit court, both cases were dismissed.
Referring to these cases, the city contends (1) that "the findings and judgment of the court are not sustained by any credible evidence" and (2) that the court erred in admitting certain evidence offered by defendant. Defendant contends (1) that the use of her property on the dates in question was a lawful "nonconforming use" authorized by the zoning ordinance of Kansas City; and (2) that the evidence complained of was properly admitted.
The record of the proceedings in the circuit court shows that by agreement of counsel the city introduced in evidence a copy of Chapter 58, Revised Ordinances of Kansas City, Missouri, 1946, as amended to March 1, 1948, referred to as the zoning ordinance. Section 58-1 of the ordinance provides that "the city is hereby divided into six classes of use districts: The residential group, termed respectively class U-1, dwellings, (class U-1 being subdivided into class U-1a and class U-1b *921 districts) and class U-2, apartments; * * all as shown on the zone maps which accompanied and were a part of the original Ordinance No. 45608, passed June 4, 1923, and the amendments thereto, and which maps are declared to be a part hereof, and which are filed with the city clerk." Defendant's property at 3616 Holmes Street is located in a "class U-1b district" as defined in Section 58-4 of the ordinance, the pertinent parts of which are as follows: "Class U-1 use districtsDwellings. * * * Class U-1bTwo-family dwellings or duplexes. In a class U-1b district, no building or land shall be used, and no building shall be erected, altered or enlarged, which is arranged, intended or designed for a use other than one of the following uses, * * * (1) Any use included in class U-1a. (2) Two-family dwellings. * * *" Section 58-7 provides: "An accessory use customarily incident to a class U-1 * * * use shall be permitted in * * * a class U-1 * * * district. * * * A store, trade or business, or practice of a profession shall not be permitted as an accessory use in a class U-1 * * * district except as follows: * * * (3) The furnishing in a U-1 (dwelling house) district, of lodging or boarding for not more than four persons in a dwelling occupied as a private residence, * * *." (Italics ours.)
Section 58-16 provides that "a nonconforming use existing lawfully at the time of the passage of this chapter may be continued except as hereinafter provided. * * *." It is not contended that the other provisions of Section 58-16 have any application here. Section 58-50 is the penalty section of the ordinance.
It is conceded that the zoning law (original Ordinance No. 45608) so restricting the use of the property located at 3616 Holmes Street was enacted and became effective on June 4, 1923. It is also conceded that on June 4, 1923 and for several years prior thereto the property in question was owned and occupied by Mr. and Mrs. Robert R. Smith, and that the Smiths (or Mrs. Smith) continued to live there until defendant bought the property October 14, 1931. There was some evidence that Mr. Smith died in 1930.
It appears from the city's evidence that the commissioner of buildings and inspections issued a "cease and desist order" in the fall of 1947, directing defendant to comply with the provisions of the zoning ordinance. Defendant appealed from the order to the board of zoning adjustment where she requested permission to furnish lodging for "approximately twenty roomers in the garage at 3616 Holmes Street." Section 58-41 of the zoning ordinance provides for such an appeal. At the public hearing before the board on November 25, 1947, defendant appeared in person and was represented by an attorney. Her attorney stated to the board that "as to the property at 3616, the National School of Aeronautics has been sending GI's out there, ex-GI's who were here on the government training program. * * * She has more than are authorized under the zoning; she has 6, 7 or 8 in the garage and between thirty and forty in the house and garage. * * * We are not going to raise any objection to any effort to keep boarding and rooming houses out of that district. * * * Right now we can't get any place where these men could go for the amount Mrs. Wilhoit is charging them. They cannot pay more than that. * * * Mrs. Wilhoit agrees, * * * that if she can keep these boys who are there, until the winter is over, * * * then she will bring down the number of people in there * * * to the required zoning." On December 2, 1947, the board denied defendant's application and notified her to comply with the requirements of the zoning ordinance within ninety days. Defendant agreed to all of the conditions stated in the notice.
On March 12, 1948, defendant again appeared before the board of zoning adjustment and requested a further extension of time in which to reduce the number of roomers at 3616 Holmes Street, and the board extended the time to May 1, 1948. On May 11, 1948, defendant made a third request for an extension of time which was denied by the board. She then filed an application with the city plan commission *922 requesting a change in zoning of her property from "class U-1b use district" to "class U-2 use district." Class U-2 use included "boarding houses or lodging houses" for more than four persons. See Section 58-5. The commission, after a public hearing on June 3, 1948, and in accordance with Section 58-42 of the ordinance, recommended to the city council that the application be denied. Sometime later an ordinance providing for the requested change in zoning was presented to the city council, which followed the recommendation of the commission and refused to enact such an ordinance. Meantime, the commissioner of buildings and inspections notified defendant to comply with the zoning ordinance on or before July 3, 1948. As stated, the two informations described above were filed on July 16, 1948, and September 14, 1948, respectively.
Other evidence introduced by the city tended to show that from September or October, 1947 until after August 30, 1948, the property in question was used continuously for the purpose of furnishing lodging for more than four persons; and that at times during the period mentioned, defendant furnished lodging for "25 to 30" persons. It is to be borne in mind that the first information charged violation of the ordinance on or about July 9, 1948, while the second information charged violation on or about August 30, 1948. It is unnecessary to state in detail the city's evidence relating to the number of roomers on the dates just mentioned, since it appears that defendant's attorney formally admitted during the trial "that at all times mentioned in these various cases" seven men whose names appear in the record "were roomers or tenants of Mrs. Wilhoit and that they did pay rent at 3616 Holmes." The record also shows that on the second day of the trial counsel for the respective parties informed the court that they had agreed "that during all of the times and dates in question in any of these actions * * * Mrs. Wilhoit had at least twelve or thirteen roomers at the house at 3616 Holmes Street." It is stated in defendant's brief that she "admitted having more roomers than the zoning ordinance would permit, unless, as she contended, there was a nonconforming use, as provided by Section 58-16 of such zoning ordinance."
As stated above, Section 58-16 provides that a nonconforming use existing lawfully at the time of the passage of the ordinance may be continued, subject to certain conditions not here involved. Since this section constitutes an exception to the provisions of Sections 58-4, 58-7, and 58-50, which restrict the use of property in the district here involved and provide a penalty for the violation of the zoning regulations, a question arises whether the city had the burden of proving that a nonconforming use of the property in question did not exist on June 4, 1923, the effective date of the original zoning ordinance, or whether defendant had the burden of proving a nonconforming use on that date and a continuation of such use until the dates of the alleged violations. It is the general rule that where the accused relies as a matter of defense on an exception in a statute or municipal ordinance, and the exception is a part of the enacting clause, or its terms are part of the description of the offense, the burden is upon the prosecution to prove that the accused is not within the exception or exemption, except in certain cases where the facts to prove such negative are peculiarly within the knowledge of the accused. Where, however, the exception or exemption is not in the enacting clause or part of the description of the offense, the accused has the burden of proving that he is within the exception or exemption. 22 C.J.S., Criminal Law, § 572, p. 886; 62 C.J.S., Municipal Corporations, § 341, p. 691. See State v. Sutton, 24 Mo. 377; State v. Pemberton, 235 Mo.App. 1128, 151 S.W.2d 111. Section 58-16 is not a part of the enacting clause of the zoning ordinance, nor is it a part of the description of the offenses here involved. Its provisions appear in a separate and distinct section of the ordinance. We hold, therefore, that defendant had the burden of proving a nonconforming use of her property on June 4, 1923, and a continuation of such use until the dates of the alleged violations.
*923 Defendant offered the following evidence on the issue of a nonconforming use: Defendant testified on direct examination that after the death of her husband in February, 1923, she continued to live in the family home at 1008 Valentine Road, Kansas City, Missouri; that she was interested in buying a rooming house and "went to 3616 Holmes Street the last part of March or first part of April, 1923," but did not buy the property at that time, and continued: "I looked at the property.
"Q. Did you go through the property? A. Yes.
"Q. Did you observe evidence there of occupancy by more than one family? A. Yes, sir. * * *
"Q. What did you find? * * * A. I found she (Mrs. Smith) had seven or eight guests. * * * Paid guests. * * I saw her large Roper range, cook stove with three heating ovens. * * * She was preparing a dinner. * * *
"Q. What was she doing? A. She was preparing a meal for her boarders."
Defendant testified on cross-examination:
"Q. Did you go all through the house? A. Not entirely all through it at that time. I found out the price.
"Q. Then you saw the kitchen? A. I didand the downstairs and some of the second floor. * * *
"Q. When you were thereas I understand it, all that you know about roomers there is what the lady (Mrs. Smith) told you, is that right? A. That is right. * * *
"Q. She had how many did you say? A. Well, just judging from the conversation
"Q. Judging from what she told you? A. Yes, it has been a long time ago. * * *
"Q. She indicated to you she had seven or eight tenants? A. Well, something like that, there were some there. * * * I didn't see them but from the remarks that were made
"Q. It couldn't have been 1931 and not 1923? A. Of course years go by. * * * I feel positive that she told me that because that is the only kind of property I was interested in. * * *
"Q. When were you there again? A. Well, it would be about September 16, 1931."
Defendant said that when she looked at the property in 1923, she was there "not much more than half an hour."
It was admitted by counsel for the city that a Mr. Edwards, if called as a witness, would testify that "during the 1920's" and "a number of years before Smith's death," he lived in the Smith home for about a year. Defendant's counsel admitted that "Morris R. Smith, son of Mr. and Mrs. Robert R. Smith, would testify, if he were present in court, that his father died in 1930, that his mother is living in Philadelphia, that his parents owned the property at 3616 Holmes until it was sold to Mrs. Wilhoit in 1931, that they bought the house in 1914, that up until the time that Mrs. Wilhoit moved into the place at no time did Mr. and Mrs. Smith ever have any roomers or boarders in that house." Three witnesses for the city testified that they lived close by while the Smiths occupied the property and knew the Smiths personally, and that at no time did they have boarders or roomers in their home. Two of these witnesses were property owners who opposed a rezoning of defendant's property when the matter was before the board of zoning adjustment.
The foregoing is all of the evidence relating to the question whether there was a nonconforming use of the property on June 4, 1923. While defendant testified that when she looked at the property in March or April of 1923, she observed "evidence there of occupancy by more than one family," that she "found" seven or eight "paid guests," and that Mrs. Smith was preparing a dinner "for her boarders," she did not attempt to describe the "evidence" upon which she based her conclusion that Mrs. Smith had seven or eight paid guests or boarders, except to say that she saw a large cook stove with three ovens, and that Mrs. Smith was preparing a meal. It seems quite clear that this testimony was not sufficient to show that the property was being *924 used for the purpose of furnishing lodging or boarding for more than four persons, or that Mrs. Smith had any roomers or boarders at the time in question. Any doubt as to its probative value has been removed by defendant's admission on cross-examination that she had no personal knowledge of the facts, and that her conclusions were based solely upon statements of Mrs. Smith. And it is worthy of note that defendant's testimony on cross-examination discloses considerable uncertainty on her part as to whether Mrs. Smith made such statements in March or April of 1923, which was about twenty-five years before the trial in the circuit court. In our opinion, the foregoing testimony of defendant had no probative value.
Furthermore, defendant offered no evidence whatsoever as to the use of the property from the time of her conversation with Mrs. Smith until August, 1925. As explained above, the statement of Mr. Edwards was admitted by agreement of counsel. It is so obvious that his statement, even though believed, did not show a nonconforming use on June 4, 1923, or at any other time, that we need not discuss it. Defendant did testify to facts tending to show that from August 1, 1925 until the date of the alleged violations of the ordinance (i. e. July 9, 1948 and August 30, 1948), and even until the trial in the circuit court, the property was used for the purpose of furnishing lodging for more than four persons. However, it would serve no useful purpose to attempt a statement of this testimony, for there was no competent and substantial evidence that a nonconforming use existed on June 4, 1923, or at any time prior to August, 1925. On the other hand, the statement of Morris R. Smith, as well as the testimony of the three neighbors, was to the effect that at no time did the Smiths have any roomers in their house. We conclude that there was no substantial evidence of a nonconforming use as defined in Section 58-16 of the zoning ordinance.
Defendant's brief reads in part as follows: "Respondent, as an alternative defense, should the court not find a nonconforming use, offered proof of the housing shortage and the lack of enforcement by the city, because of such housing shortage as evidenced by, among other things, the existing operation of numerous other rooming houses in the district which, according to the city's investigators, were in violation of the zoning ordinance. * * * Further, the evidence disclosed that the city officials had, by newspaper advertisement and other public appeals, requested and pleaded with residents of Kansas City who had available space to accept roomers and in particular G.I. trainees and veterans * * *. It was respondent's contention that should the trial court fail to find a nonconforming use, it should not permit the city to entrap her after begging its citizens to violate the zoning ordinance." As indicated in her brief, defendant offered evidence tending to show that other persons had furnished lodging for more than four persons in the U-1b district here involved; that the city officials had knowledge of these conditions, but failed to enforce the zoning ordinance against such other persons because of a housing shortage; that a housing shortage existed on the dates of defendant's alleged violations of the ordinance; and that the city officials had requested the citizens of Kansas City to take lodgers if they had available space. The city contends that the trial court erred in admitting this evidence over the city's objections that it was immaterial and did not tend to prove any facts which would constitute a defense to the charge made against defendant. The evidence was admitted subject to the objections. We think the objections were well taken.
It is no defense to a prosecution for violating an ordinance that other persons have been permitted to violate it without prosecution or punishment. City of Centralia v. Smith, 103 Mo.App. 438, 77 S. W. 488; 62 C.J.S., Municipal Corporations, § 319, p. 669. In accordance with this general rule, it is held that the failure of municipal authorities to enforce a zoning ordinance against some violators does not preclude its enforcement against others. Ryan v. City of Warrensburg, 342 Mo. 761, 771, 117 S.W.2d 303, 307; 58 Am.Jur., Zoning, § 193, p. 1045; 119 A.L.R. 1509, 1517. *925 See State ex rel. Luechtefeld v. Arnold, Mo.App., 149 S.W.2d 384, 388. Nor does the fact that city officials fail to enforce the zoning ordinance against a violator estop the city from subsequently enforcing it against him. Leigh v. City of Wichita, 148 Kan. 607, 83 P.2d 644, 119 A.L.R. 1503. See also Eichenlaub v. St. Joseph, 113 Mo. 395, 21 S.W. 8, 18 L.R.A. 590; City of Maplewood v. Provost, Mo.App., 25 S.W.2d 142. The fact that the city might have rezoned the area does not alter its obligation to enforce existing regulations. See State ex rel. Nigro v. Kansas City, 325 Mo. 95, 27 S.W.2d 1030. And there can be no doubt that the existence of a housing shortage did not give defendant the legal right to furnish lodging for more than four persons. See County Commissioners v. Ward, 186 Md. 330, 46 A.2d 684, 165 A.L.R. 816. We hold that the evidence in question was not admissible.
It may be added that there was no evidence that the city officials begged the citizens of Kansas City "to violate the zoning ordinance." As shown above, defendant appeared before the board of zoning adjustment on two occasions and was granted two extensions of time in which to comply with the ordinance. She was given a hearing before the city plan commission in regard to the rezoning of her property. All of this occurred before the city filed the complaints against her. Under these circumstances it is unnecessary to comment on defendant's contention that the court "should not permit the City to entrap her."
Since defendant admitted that she furnished lodging for more than four persons on the dates in question, and since there was no competent and substantial evidence to show a nonconforming use on June 4, 1923 or to establish any other defense, the judgment in each case should be reversed and the causes remanded.
This brings us to the third case. The information in Case No. 21402 (No. 4866 in the circuit court) charged that on or about September 30, 1948 "within the corporate limits of Kansas City, and in and upon 3616 Holmes, one Ethel J. Wilhoit did then and there unlawfully and wilfully alter the basement at 3616 Holmes by installing partitions without first having obtained a permit from the Building Commissioner. All in violation of Section 201 of Ord. 9519 known as the Building Code, of the Revised Ordinances of 1946 of Kansas City, Missouri." Defendant was convicted in the municipal court and fined the sum of $150. As heretofore stated, she appealed to the circuit court, where the case was dismissed and defendant discharged after a trial de novo before the court without a jury.
The city introduced in evidence Sections 201 and 308 of Ordinance No. 9519. The material part of Section 201 provides: "No person shall construct any building, excavate for, nor enlarge, alter, repair, move, convert, or demolish any building, or cause the same to be done, without first obtaining a building permit therefor from the Building Commissioner." Section 308 is the penalty section of the ordinance.
The only evidence offered by the city to prove the alleged violation of the ordinance was as follows: Charles A. Lyon, city building inspector, testified that he inspected the premises in question on July 6, 1948, and continued: "Q. On July 6, 1948, were there any signs of conversion of the property? A. Yes, quite a little work done in the basement, it looked like somebody was making rooms down there, ceiling, log siding, quite a little of it. * * * I asked her about it. She said some of the G.I. boys had undertaken to make some rooms down there. Q. Any other conversation about it? A. There wasn't much." The city's Exhibit "4" is a report made by Charles A. Lyon to the division of buildings and inspections and dated August 30, 1948. The report reads in part as follows: "Re 3616 Holmes * * * 3 rooms partitioned off in basement. Not completed, no work done lately. MaterialLog siding on wood studs some wood lath on wood studs." The evidence was that defendant did not have a permit from the building commissioner to make any alterations in the basement of her house. It will be noticed that the city's evidence related to the condition of the premises on July 6, 1948 and August 30, 1948, whereas the information charged violation *926 of the ordinance on September 30, 1948. Ordinarily, it is not essential to prove the commission of the offense on the particular day alleged in the indictment or information; but the act which it is charged the defendant committed is vital.
The city asserts that "the proof of alterations being made in the basement by the erection of partitions for the creation of new rooms for roomers, which construction work was being done by G.I.'s, and fully admitted by the respondent as having continued without a permit, stands wholly undenied and without any word of defense or even reference made thereto by the respondent." The record does not support this contention. The city had the burden of proving that defendant violated Section 201 of the building code. As to the "proof of alterations," it is apparent that the city's evidence was very general in character. The report of the city inspector (Exhibit "4") purports to describe the condition of the basement on August 30, 1948. But it does not state any facts tending to show that the three rooms were "partitioned off" by defendant or that she caused the work to be done. Nor does it show that the work was done after defendant acquired the property. In fact, the report stated: "Not completed, no work done lately." Obviously, this evidence was too indefinite to warrant a finding that defendant was guilty of the misdemeanor charged in the information. The same is true of the inspector's statement on the witness stand that "quite a little work done in the basement, it looked like somebody was making rooms down there," etc. But the city contends that defendant admitted that "certain G.I.'s had been doing this alteration in the basement for her for the purpose of having more rooms for rent." The only evidence of any admission by defendant was the testimony of the city inspector who stated that on July 6, 1948, the defendant said "some of the G.I. boys had undertaken to make some rooms down there." However, the defendant testified on cross-examination that she did not build any "rooms" or "walls" in the basement, but "some were already there." We think the trial judge could well have found from all of defendant's testimony that no rooms or partitions for rooms were built in the basement of her house after she acquired the property; and he evidently believed her testimony despite the evidence concerning her alleged admission.
Under this record, the trial court cannot be convicted of error in discharging defendant. It follows that the judgment in this case should be affirmed.
SPERRY, C., concurs.
PER CURIAM.
The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment in Case No. 21400 (No. 4648 in the circuit court) is reversed and the cause remanded; the judgment in Case No. 21401 (No. 4867 in the circuit court) is reversed and the cause remanded; and the judgment in Case No. 21402 (No. 4866 in the circuit court) is affirmed.
DEW, P. J., and CAVE, J., concur.
BROADDUS, J., not participating.